IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:10-cr-00200 (LMB) |
| v. | ) | The Honorable Leonie M. Brinkema |
| LEE BENTLEY FARKAS | ) | |
| *Defendant.* | ) | |

**UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

The United States opposes defendant Lee Bentley Farkas' motion for early termination of his prison term under the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A). ECF Nos. 591 & 592. Farkas is one of the most serious white-collar offenders the Department of Justice has prosecuted over the period of at least the last 20 years, committing crimes that caused losses to victims totaling in the **multi-billions of dollars**. Farkas was convicted at trial in April 2011 and sentenced by this Court to 360 months' imprisonment. ECF No. 299.

Farkas turns now to this Court for relief based on the national coronavirus epidemic. As of the time of this filing, he will have served only about 111 months – or 30.8% – of the 360-month sentence of incarceration for his convictions. Farkas has nearly 16 years remaining until his projected release date of October 31, 2036, which assumes credit for good time served. ECF No. 592, Exh. 3.

Farkas bears the burden to show that compassionate release is warranted in his case, and he fails to meet his burden. Although COVID-19 infections have appeared within the inmate population at FCI Coleman Low, Farkas has not demonstrated that his conditions of confinement subject him to a particularized risk of infection. Importantly, his facility is taking extra

precautions as discussed in more detail below. Nor has Farkas shown, in view of current CDC guidelines about COVID-19, that his medical history and age create a particularized risk of severe illness that create an "extraordinary and compelling reason" to reduce his sentence. His motion is not favored under the § 3553(a) sentencing factors, and the Court should deny it.

## RELEVANT BACKGROUND & PROCEDURAL HISTORY

### I. Farkas is serving a sentence for serious criminal offenses in which he defrauded many thousands of victims out of billions of dollars.

In April 2011, following a trial by jury, Farkas was convicted on 14 counts of a multi-count indictment, including Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1348, 1344, 1349, and of the substantive crimes underlying the conspiracy, including Bank Fraud, Wire Fraud, Wire Fraud Affecting a Financial Institution, and Securities Fraud. From 2002 to 2009, when Farkas served as CEO and then Chairman of the company Taylor, Bean & Whitaker Mortgage Corporation (TBW), he organized and led a sophisticated, complex financial scheme to defraud thousands of identifiable victim investors and numerous U.S. government institutions, taxpayer-funded programs, and domestic and foreign companies. *See, e.g.*, PSR ¶ ¶ 37-54 (victim impact). Some of these innocent victim investors suffered devastating personal consequences or financial ruin. Other corporate and institutional victims reported staggering losses, like the Federal Deposit Insurance Corporation (FDIC), which reported an actual loss of $1.8 billion attributable to Farkas' scheme. PSR ¶ 56.

In the end, Farkas' misdeeds were investigated, exposed, and prosecuted by the United States through to his conviction at trial. Farkas did not accept responsibility for his conduct, and he testified untruthfully under oath at trial, leading the Court to apply an enhancement at sentencing for obstruction of justice. PSR ¶ ¶ 67-68. As noted above, Farkas was sentenced to 360 months' imprisonment, nearly 16 years of which he has yet to serve.

## II. Farkas has apparently exhausted his administrative remedies, insofar as he afforded BOP more than 30 days to evaluate a request for compassionate release before moving for relief in this Court.

Throughout the COVID-19 epidemic, BOP has continued to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A). This form of administrative relief for an inmate remains available separately from BOP's priority program under the CARES Act for home confinement of eligible individuals vulnerable to COVID-19 (discussed below). Under § 3582(c)(1)(A), a defendant cannot obtain relief from this Court until BOP is given 30 days to evaluate the defendant's motion for compassionate release based on the threat of COVID-19.

The United States is aware that Farkas submitted an administrative request for compassionate release related to COVID-19, which the Warden denied on April 8, 2020. *See* ECF No. 592-1, Exh. 5 (letter from Warden Lane explaining, among other things, that Farkas' "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from [his] sentence"). Exhibits provided with the defendant's motion also include copies of a series of electronic communications between Farkas and personnel at FCI Coleman between April and July 2020, in which Farkas requested that BOP exercise its authority under the CARES Act to release him to home confinement, and requested reconsideration of BOP's decision after BOP informed him that he would not be released under that program. *See* ECF No. 592-1, Exhs. 6-8. Farkas did not appeal the Warden's April 8, 2020 decision on compassionate release. *See* ECF No. 592, at 6. However, the United States declines to assert at this time that Farkas failed to exhaust his administrative remedies.

## III. BOP considered and declined to release Farkas to home confinement.

As the Court is likely aware, the CARES Act temporarily enlarged BOP's discretion to place inmates in home confinement. *See* CARES Act, Section 12003(b)(2) (temporarily

expanding BOP's existing authority under § 3624(c)(2) to designate prisoners to home confinement). In Memoranda of March 26, 2020 and April 3, 2020, the Attorney General directed BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors, particularly those at institutions where there have been COVID-19 outbreaks.

BOP is devoting all available resources to advancing these directives. In doing so, it considers the "totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and [a] non-exhaustive list of discretionary factors" described in the Attorney General's March 26, 2020 memorandum. Since that date, BOP has used its CARES Act authority to place more than 7,662 inmates on home confinement.[1] Farkas was not one of them, despite multiple levels of BOP internal review of his case. *See* ECF No. 592, Exhs. 6-8

In his motion, Farkas overemphasizes the importance of how a single variable may have affected BOP's review under its CARES Act priority program – namely, whether individuals who have served less than 50% of their sentence (Farkas has not) may be released to home confinement. His argument on that issue is largely inapposite and potentially distracting to the main inquiry here. This Court must apply its own legal standard to Farkas' motion and must weigh whether he should receive the extraordinary relief of early termination of his sentence. Not surprisingly, though, an inmate like Farkas – who BOP declines to include in its priority program – generally is not an appropriate candidate for compassionate release.

## LEGAL STANDARD

A sentencing-reduction motion under § 3582(c)(1)(A) is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress created a narrow statutory framework in

---

[1] *See* https://www.bop.gov/coronavirus/ (last retrieved September 10, 2020).

which defendants, the BOP, and the Sentencing Commission all play a relevant part. To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A). Rather, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). However, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.* In the compassionate release statute itself, Congress then made the Commission's policy statement binding on this Court. *See* § 3582(c)(1) (requiring courts to find "extraordinary and compelling reasons warrant" a reduction *and* "that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission"); *see also Dillon v. United States*, 560 U.S. 817, 826 (2010) (so holding for identical language in § 3582(c)(2)).

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and

compelling reasons warrant the reduction." *Id.* § 1B1.13(1)(A).[2] Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Third, the court must conclude that "[t]he reduction is consistent with this policy statement." *Id.* § 1B1.13(3).

The Sentencing Commission has identified four categories of extraordinary and compelling reasons:

(A) Medical Condition of the Defendant;

(B) Age of the Defendant;

(C) Family Circumstances; and

(D) Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1. Commentary to § 1B1.13, in turn, clarifies that the open-ended provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."[3] *Id.*

---

[2] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant who is at least 70 years old and has served at least 30 years on his conviction is eligible for a reduction. *See* U.S.S.G. § 1B.13(1)(B). Farkas satisfies neither prong of that standard.

[3] Consistent with subdivision (D), the Bureau of Prisons has identified several nonexclusive factors for determining whether "other" extraordinary and compelling reasons exist. These include the defendant's criminal and personal history, the nature of his offense, disciplinary infractions, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense." BOP Program Statement 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The Program Statement explains that the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing." *Id.* at 1.

Ultimately, a defendant bears the burden to prove that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See, e.g.*, *United States v. Barringer*, No. PJM 13-0129, , at *2 (D. Md. May 19, 2020); *United States v. Kubinski*, No. 3:93-cr-28, 2020 WL 2475859, at *2 (E.D.N.C. May 13, 2020); *United States v. Harper*, No. 7:18-cr-25, 2020 WL 2046381, at *2 (W.D. Va. Apr. 28, 2020); *United States v. Edwards*, — F. Supp. 3d —, , at *3 (W.D. Va. 2020); *United States v. Mangarella*, 2020 WL 1291835, at *2 (W.D.N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019). *See generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

Courts have properly concluded that a generalized risk of being infected by the coronavirus fails by itself to justify compassionate release. "[I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)); *see also United States v. Harper*, No. 7:18-cr-25, 2020 WL 2046381, at *3 (W.D. Va. Apr. 20, 2020) (same).

## ARGUMENT

### I. There is no "extraordinary and compelling reason" for compassionate release because Farkas has not shown that he faces a particularized risk of infection at FCI Coleman Low.

This Court need not reach the question of whether Farkas' age and medical conditions support his request for relief, because he fails at the outset to show that his current environment

subjects him to a particularized risk of contracting COVID-19. *See also* ECF No. 592, Exh. 5 (letter from Warden Lane stating that Farkas' "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from [his] sentence"). To be sure, the appearance of any positive cases of COVID-19 at a BOP facility is a matter of concern, and Farkas understandably highlights for the Court that BOP has publicly reported a significant number of infections at his facility, *see* ECF No. 592, at 9-10. However, these numbers must be considered in fulsome context.

As of the time of this filing, 106 of the approximately 1,934 total inmates, along with 20 staff, at FCI Coleman Low were reported on BOP's website as testing positive for COVID-19.[4] (These numbers are slightly lower than the numbers reported on the date Farkas filed his motion.) This means almost 95% of inmates at Farkas' facility are *not* actively infected with COVID-19. Moreover, as he acknowledges in his motion, Farkas is held at a physically separate, minimum security satellite camp housing only 203 of those 1,934 inmates. *See* ECF No. 592, at 2. Farkas does not contend that his confinement at this separate camp places him at higher risk of infection, or even equal risk, to the rest of the population in FCI Coleman Low.

In response to an inquiry by the U.S. Attorney's Office, BOP provided additional information this morning, September 10, 2020, that may be helpful to the Court. According to the Command Center at the facility, inmates who test positive for COVID-19 are being temporarily removed from FCI Coleman Low (whether main facility or satellite camp) and transferred to a nearby USP for housing and quarantine in a special isolation unit. This information from BOP seems consistent, perhaps, with references made by Farkas himself in the

---

[4] *See* https://www.bop.gov/coronavirus/index.jsp (COVID-19 Cases: FCI Coleman Low) (last retrieved Sept. 10, 2020).

email communications he attaches as exhibits to his motion. For instance, Farkas writes in an April email that FCI Coleman Low has "inmates quarantined" and conveys that he is worried about what may occur "*if* the virus attacks us in 'C' building [his assigned dormitory]" (emphasis added). ECF No. 592-6, at 5.

Accordingly, the most logical conclusion on the facts known to the parties is that Farkas' conditions do *not* place him at a particularized risk of contracting COVID-19. In fact, BOP is undertaking serious efforts at FCI Coleman Low to protect inmates like Farkas and to manage the risk of infection, including quarantining individuals who test positive and moving them offsite.[5]

## II. There is no "extraordinary and compelling reason" for compassionate release because Farkas has not shown that his age and medical conditions put him at a higher, particularized risk of susceptibility and serious illness from COVID-19.

Farkas' 67 years of age should receive some, but minimal, weight in the Court's evaluation of whether his case presents an "extraordinary and compelling" reason for relief.

---

[5] The United States respectfully submits for the Court's attention that BOP has altered, and continues to improve, operations within federal prisons to implement guidance issued by the Centers for Disease Control and Prevention (CDC) to manage the transmission of COVID-19. The current modified operations plan requires that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly-admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

A variety of measures related to stopping or limiting social and legal visits remain in place, to curtail the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased

Under the CDC's current guidance, Farkas' age is associated with a susceptibility and risk of serious illness from COVID-19 that is likely higher than that of comparable, younger individuals; the same CDC guidance also communicates, however, that his risk is likely to be meaningfully lower than that of comparable, older individuals.[6] This sort of evidence should not be compelling to the Court. Thousands of other federal inmates currently housed in BOP facilities have reached the age of 67 (indeed, many are older than this defendant), yet they remain appropriately incarcerated on less serious crimes than those Farkas committed.

Farkas also argues, in view of certain medical documents from both private medical providers and BOP health services, that his medical history places him at particularized risk of susceptibility and severe illness from COVID-19. Here again, his claims are unavailing on the evidence available, absent further expert opinion about how his current health may be affected by contraction of COVID-19.

Only one of the illnesses in the list of afflictions identified by Farkas in his motion – namely, coronary artery disease, *see* ECF No. 592, at 1, 12 – appears to be a disease that the CDC's updated guidance identifies as placing an individual "at increased risk of severe illness from COVID-19."[7] And in some cases, a diagnosis of coronary artery disease may establish "an

---

detainees' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors. Other details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Older Adults).

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDCAArefVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions.

extraordinary and compelling reason" to grant an inmate's request for compassionate release during this unprecedented epidemic. Here, however, the medical documentation corroborating the diagnosis is principally if not exclusively dated from long ago, in 2008 and 2009. *See* ECF No. 592, Exh. 1 (Marion Heart Center records). More recent – and, arguably, more relevant – medical reports paint a dramatically improved picture of Farkas' heart health.

For example, one report in the BOP Health Services file, describing a medical assessment performed in December 2019, noted that Farkas had disclosed a prior history of heart problems but demonstrated "[n]o cardiac distress" and "denie[d] … chest pain," *see* ECF No. 592, Exh. 2 (BOP Health Services Encounter on 12/19/20, at 2). Earlier the same year, in March 2019, a separate report by a different doctor stated, among other things, that Farkas "has *past* [] A. Fib *that has resolved*," is "[d]oing well at the present time," and "denies any sob, chest pain, abdominal pain, … or other symptoms." *Id.* (BOP Health Services Encounter on 3/4/2019, at 1) (emphasis added).

These same records and others attached to Farkas' motion describe treatment and medications important to the ability of Farkas' healthcare providers to continue to monitor his health and to control his symptoms, but they do not appear to reflect the medical view that coronary heart disease or other heart disease is affecting him now, or is becoming clinically unmanageable. *See, e.g.*, *United States v. Ayon-Nunez*, No. 1:16-CR-130, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release.") (internal quotation marks omitted); *Wilson v. United States*, 2020 WL 3315995, at *3 (E.D. Va. June 18, 2020) (well-controlled hepatitis B not sufficient to warrant release, and "no indication that the medical staff [at the facility] are incapable of managing [defendant's] medical condition"). Thus, Farkas has not offered the

Court enough information to conclude that continuing to serve his prison sentence would subject him to an unacceptable risk from COVID-19.

Farkas' medical records also corroborate that he has suffered in the past, and in some instances continues to suffer, from other health conditions (*e.g.*, hypertension, skin infection, gastric ulcers, sleep apnea, and high cholesterol, among others). *See* ECF No. 592, at 12-13 & Exh. 2. These do not materially bolster his argument before the Court. Of these conditions – at least insofar as the United States can discern the contents of the motion and medical records – only hypertension falls in a CDC category that "might" leave an individual at increased risk for severe illness from COVID-19.[8] And once again, for this defendant, more recent medical reports seem to reflect that his hypertension is being adequately treated and medicated.

Finally, Farkas calls to the Court's attention various other aspects of his health, which may have involved significant health and wellness ramifications for him in his past or may continue to do so in the present. This information is irrelevant, or nearly so, to the Court's inquiry today. The CDC does not associate these health issues with creating a greater risk of susceptibility and severe illness related to COVID-19, which must remain the focus of Farkas' request for compassionate release. In short, he has not met his burden to establish that his medical situation, or any other personal characteristics such as his age, create an "extraordinary and compelling reason" to support this Court's grant of a sentence reduction.

[8] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (People With Certain Medical Conditions).

**III. The Section 3553(a) sentencing factors do not weigh in favor of a sentence reduction or compassionate release.**

At the time of Farkas' sentencing in 2011, this Court carefully reviewed all the facts and circumstances surrounding his conviction at trial. The Court concluded that the nature and seriousness of the defendant's crimes, his personal characteristics, and the § 3553(a) sentencing factors militated in favor of a lengthy term of imprisonment. The facts supporting the need for a severe punishment and lengthy term of imprisonment have not changed. Farkas is quick to point out that his offenses were non-violent and that he has committed no disciplinary infractions while incarcerated.[9] As this Court knows too well, those assertions *hardly* tell the story of the awesome threat that a persistent, depraved white-collar criminal like Farkas can pose to the general public.

In short, Farkas was the mastermind of a historic fraud, who conspired to swindle banks, regulators, and American taxpayers out of their hard-earned dollars and threatened the confidence and integrity that investors around the world associate with American markets. He sustained his criminal activity throughout the 2008 recession, during which many law-abiding American citizens and businesses were struggling for financial survival. All the while, he lived an ostentatious lifestyle based on millions of dollars he personally misappropriated, complete with a private jet, antique cars, and multiple vacation homes. Yet Farkas has served only a small portion of the punishment imposed on him – hardly 30% of his term of imprisonment. The punishment in this case will never restore the livelihood of many of his victims. The lengthy sentence is necessary to promote the rule of law and to represent a deterrent to those who might be tempted to engage in similar conduct. Factoring in Farkas' devious and deceptive nature and

---

[9] Following the rules at a BOP facility is expected and, moreover, is already rewarded through existing mechanisms such as good time served.

his indifference to the damage he inflicted on his victims, it would be a disservice to our system of justice to diminish the reasonable and appropriate sentence this Court rightly imposed.

**CONCLUSION**

While the pandemic has created unprecedented challenges, district courts evaluate requests for compassionate release on a case-by-case basis. Farkas has failed to meet his burden of showing "extraordinary and compelling reasons" for relief and that a favorable disposition is warranted under the 3553(a) sentencing factors. The Court should therefore deny his motion.[10]

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: /s/

Amelia R. Medina
Special Assistant United States Attorney
Tony Roberts
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(202) 299-3938

[10] If this Court were to disagree with the government's position, any order that this Court issues to grant compassionate release should protect the public by requiring the defendant to undergo a 14-day quarantine under BOP control.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of September, 2020, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

By: /s/
Amelia R. Medina
Special Assistant United States Attorney